UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

CHARLENE R. GRAVES,

                              Plaintiff,

        v.                                        5:12-CV-48

MICHAEL J. ASTRUE
Commissioner of Social Security,

                              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THOMAS J. McAVOY
Senior United States District Judge

## DECISION and ORDER

        Plaintiff Charlene Graves brought this suit under § 205(g) of the Social Security Act

("Act"), as amended, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of

Social Security ("Commissioner") denying Plaintiff's application for disability and

supplemental security benefits.

## I.      FACTS

### a. Procedural History

        On July 17, 2008, the Plaintiff filed applications for disability insurance benefits and

supplemental security income.  (T. 149-59, 164, 169.)   On August 13, 2010, Administrative

Law Judge ("ALJ") Robert E. Gale denied the application by finding that: (1) Plaintiff had not

engaged in substantial gainful activity since November 1, 2006, the alleged onset date (T.

31); (2) Plaintiff's fibromyalgia, mixed connective tissue disease ("MCTD"), and adjustment

disorder with depressed mood constituted severe impairments (T. 32); (3) Plaintiff did not

have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. § 416.925 and §416.926  (T. 35); (4) Plaintiff had the Residual Functional Capacity ("RFC") to lift and carry twenty pounds occasionally and ten pounds frequently; sit, stand, and walk for six to eight hours in a workday; occasionally perform postural activities (T. 35); and mentally could perform the basic demands of competitive, remunerative, unskilled work such as understanding, carrying out, and remembering simple instructions, responding appropriately to supervision, coworkers and usual work situations, and dealing with changes in a routine work setting (T. 35); and (5) based on Plaintiff's age, education, work experience and RFC, there were jobs that exist in significant numbers in the national economy that the Plaintiff can perform (T. 35).

On November 28, 2011, the Administration's Appeal Council denied review of the ALJ decision. (T.1.)  Plaintiff commenced the present action for a review of the Commissioner's decision.

**b. Medical Background**

The Court primarily adopts Plaintiff's medical history as set forth in her objections to the findings of the ALJ. (Pl. Mem. 2-13.)  Plaintiff's alleged disability onset date is November 1, 2006, when she was 46 years of age. (T. 153, 164.)  Plaintiff had obtained her General Education Diploma, and reported past work as a bus aide, cashier, home health aide, machine operator, and in the fast food industry. (T. 174, 176.)  Plaintiff's date last insured was September 30, 2011. (T. 164.)

On September 1, 2006, Plaintiff reported to the hospital for abdominal pain that had progressively become more severe. (T. 261.)  She was treated with levofloxacin and

metronidazole intravenously, as well as morphine as needed, and was diagnosed with acute diverticulitis and right renal cysts. (T. 261). Plaintiff was discharged in good condition on September 5, 2006 and was prescribed with Metronidazole, Levofloxacin, Hydrochlorothiazide, Diltiazem CD, and Clopidogrel. (T. 261-62.)

On November 16, 2006, Plaintiff treated with Alfredo Perez, M.D., for follow-up treatment. (T. 402.) Dr. Perez diagnosed Plaintiff as suffering, *inter alia*, from stage 3 chronic kidney disease and class 2 obesity. (T. 402.) On January 1, 2007, Plaintiff treated again with Dr. Perez for follow-up treatment. (T. 401.) Dr. Perez diagnosed Plaintiff as suffering from stage 2 chronic kidney disease, anemia, and MCTD based on a positive ANA test. (T. 401.) He also referred Plaintiff to a rheumatologist. (T. 401.)

On April 4, 2007, Plaintiff saw Hom P. Neupane, M.D., for muscular pain, a positive ANA test, and evaluation for autoimmune disease. (T. 355.) Plaintiff gave a "history of aches and pains for 5 years" and complained of "numbness and tingling in her hand." (T. 355.) Plaintiff further explained that "she cannot pick up heavy objects" and "she uses orthopedic shoes to walk." (T. 355.) She also reported that "she wakes up frequently at night" because of the pain. (T. 355.) On examination, Dr. Neupane found that Plaintiff "has cold extremities suggestive of Raynaud's." (T 355.) Dr. Neupane further found that Plaintiff "does have tender fibromyalgia points." (T. 356.) He diagnosed Plaintiff as suffering from, *inter alia*, mild impairment of the kidneys and clinical fibromyalgia. (T. 356.) Dr. Neupane further found that "the association of connective tissue disease cannot be ruled out." (T. 356.) He prescribed Nortriptyline. (T. 357.)

On April 5, 2007, x-rays of Plaintiff's hands revealed "evidence of very early degenerative joint disease in the interphalangeal joints of all the digits ... a slight deformity of

the base of the metacarpal of the left little finger," and a "boutonniere deformity of the left index finger." (T. 320.) It was noted that "[t]he degree of change is not uncommon in patients of this age," (T. 320) in regards to the degenerative joint disease. (T. 320).

On April 6, 2007, Plaintiff again saw Dr. Perez for follow-up treatment. (T. 399.) On examination, Dr. Perez found that Plaintiff had gained 6 pounds. (T. 399.) He diagnosed her as suffering from MCTD and stage 2 chronic kidney disease. (T. 399.) He prescribed Nortriptyline and Lovastatin. (T. 399.)

On April 12, 2007, Plaintiff reported to the emergency department for abdominal pain that radiated down her leg, and was seen by Davis W. Clark Jr., D.O. (T. 268). Plaintiff was treated for diverticulitis. Plaintiff was discharged home with prescriptions for Lortab, Cipro, and metronidazole. (T. 270.)

On April 13, 2007, a CT scan of Plaintiff's abdomen revealed minimal bibasilar atelectasis, a small hernia, a renal cyst in the right lower pole, and "low density lesions too small to characterize." (T 318.) A CT scan of the pelvis showed "[d]iverticulosis with mild pericolonic soft tissue stranding in the region of the proximal sigmoid colon consistent with diverticulitis" and a "[s]mall amount of fluid in the pelvis." (T. 318.)

On May 4, 2007, Plaintiff had a follow up appointment with Dr. Neupane for pain and a positive ANA test. (T. 353.) Plaintiff complained that she continues to have spasms and pain in her thighs and feet. (T. 353.) On examination, Dr. Neupane found that Plaintiff "does have tender fibromyalgia points." (T. 354.) He also found "mild soft tissue swelling in [Plaintiff's] MCP ["metacarpophalangeal"] and PIP ["proximal interphalangeal"] joints." (T. 354.) Dr. Neupane further found that Plaintiff "has a lot crepitus in her knees." (T. 354.) X-rays of Plaintiff's wrists revealed the following: "deformity of the base of the metacarpal, left

little finger suggestive of old healed fracture," and "[r]esolved small ossification center distal to the left ulnar in a triangle." (T. 354.) Dr. Neupane assessed, *inter alia*, positive ANA, active fibromyalgia, and Raynaud's disease. (T. 354.) He prescribed Plaquenil and Flexeril. (T 354.)

On July 3, 2007, Plaintiff met with Dr. Perez for follow-up treatment. (T. 398.) Dr. Perez diagnosed Plaintiff as suffering, *inter alia*, from stage 2 chronic kidney disease and MTCD. He ordered "renal function re-evaluation, spot albumin, and creatinine and urinary sediment evaluation." (T. 398.)

On July 6, 2007, Plaintiff attended a follow-up visit with Dr. Neupane (T. 351.) Plaintiff complained of swelling in the ankles and pain in the neck, thighs, and feet. (T. 351.) On examination, Dr. Neupane found that Plaintiff "has tender fibromyalgia points" and "mild swelling in her ankles." (T. 352.) Dr. Neupane prescribed Plaquenil, Hydrocodone, and Nortriptyline among other medications. (T. 352.)

On August 10, 2007, Plaintiff met with Dr. Neupane. (T. 379.) Plaintiff complained of fatigue. (T. 379.) On examination, Dr. Neupane found that Plaintiff "has tender fibromyalgia points" and "cold hands." (T. 380.) Dr. Neupane opined that Plaintiff's fatigue "could be related to her medications." (T 380.) However, Plaintiff's pain had improved significantly. (T. 380.) He discontinued Flexeril and continued Plaintiff's dosage of Nortriptyline and Hydrocodone. (T 380.)

On September 30, 2008, Plaintiff saw Dr. Kristin Barry for a psychiatric evaluation. Dr. Barry found that Plaintiff's gait, posture, and motor behavior were normal. (T. 275). Her thought processes were "coherent and goal directed ...." (T. 275.) Her attention and concentration were "somewhat impaired", "and her cognitive functioning was estimated to be

"in the borderline to low average range," with poor insight and judgment." (T. 275). Dr. Barry

went on to find that Plaintiff "appears able to follow and understand simple directions and

instructions. She is able to maintain her attention and concentration . . . and has poor

judgment." (T. 276) Dr. Barry also noted that Plaintiff "did appear at times to be malingering

on testing." (T. 276). She diagnosed Plaintiff as suffering from, *inter alia*, adjustment

disorder with depressed mood, history of stroke, knee and leg problems, and fibromyalgia.

(T. 276.) She recommended that Plaintiff receive "medical follow-up and individual

counseling." (T. 277.) Dr. Barry noted that Plaintiff's "allegations are partially consistent with

the examination results." (T. 276).

Dr. Barry also conducted an organicity evaluation. Dr. Barry stated that "the results

of the evaluation should be interpreted with caution . . . claimant's attitude toward the

evaluation appeared somewhat resistant and apathetic. She did not appear to be putting

forth a lot of effort . . . She was able to recall and understand the instructions, but her style of

responding was seen as very careless at times. The claimant's attention and concentration

were good. She did not evidence any severe emotional distress. However, she at times

appeared to be doing poorly because of her lack of effort." (T. 283). Plaintiff was found to

have a 4th grade reading level equivalent, (T. 283) and is "functioning in the deficient range of

intelligence." (T. 284). However, Dr. Barry again noted that the "claimant' s general cognitive

functioning . . . should be interpreted with caution . . . it is more likely that the claimant is

functioning at a higher level. She did not appear to be putting forth a lot of effort." (T. 284).

Dr. Barry repeated that Plaintiff did not put forth much effort in the examination and then

stated that her "short term auditory memory was average. Her sequential reasoning ability is

below average." (T. 284.) Dr. Barry also noted that Plaintiff's "numerical reasoning abilities

and practical judgment mediated by experience were significantly below average.  Her visual constructual skills and visual-motor efficiency  were significantly below average."  (T. 284-85.)  Dr. Barry then administered the Bender Visual-Motor Gestalt Test, again stating the results should be interpreted with caution as Plaintiff "rushed through the tasks, [and] worked in a very sloppy fashion.  [Plaintiff] did not appear to be putting forth any effort and therefore did evidence significant distortions of simplification and closure, but it does not appear as if there is a severe degree of weakness within the perceptual motor integrative field.  At this time, her reading, math, and written language abilities all appear fair."  (T. 285).  Dr. Barry's medical source statement was that "claimant at this time appears able to follow and understand simple directions and instructions.  She is able to maintain her attention and concentration."  (T. 285.)  Dr. Barry's diagnosis was identical to those found in her first evaluation.  (T. 286.)

Plaintiff was also examined on September 30, 2008 by Dr. Ganesh for an internal medicine examination.  (T. 278.)  Dr. Ganesh found that Plaintiff cannot walk on her heels or toes or squat, but she "[u]sed no assistive devices.  Needed no help changing for exam or getting on and off exam table.  Able to rise from chair without difficulty."  (T. 279.)  For the musculoskeletal portion of the exam, Dr. Ganesh found that Plaintiff's "[cervical spine shows full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally...[l]umbar spine shows full flexion ... and full rotary movement bilaterally.  SLR negative bilaterally.  Full ROM of hips, knees, and ankles bilaterally.  Strength 5/5 in upper and lower extremities ... Joins stable and nontender.  Tenderness is two to lateral epicondyle.  Control points is two to mid-forearm."  (T. 280.)  For the fine motor activity of hands, Dr. Barry noted that Plaintiff's "hand and finger dexterity intact.  Grip strength 5/5 bilaterally."  (T. 280.)  Dr. Ganesh's

medical source statement was that Plaintiff had "no gross physical limitation noted to sitting, standing, walking, ro the use of upper extremities." (T. 280.)

On October 28, 2008, State Agency Analyst, S. Marino completed a physical RFC assessment. (T. 301-06.) Marino found that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift/and or carry 10 pounds, stand and/or walk with normal breaks for about 6 hours in an 8 hour workday, sit with normal breaks for about 6 hours in an 8 hour work day, and push and/or pull unlimited, other then as shown for lift and/or carry evaluations. (T. 302.) The assessment stated that Plaintiff may frequently have limitations in balancing, stooping, kneeling, crouching, or crawling, and may occasionally have limitations claiming stairs or ladders. (T. 303.)

The same day, medical consultant R. Nobel completed a mental RFC assessment. (T. 307-10.) Consultant Nobel opined that Plaintiff is moderately limited in the following areas: the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, the ability to accept instructions and respond appropriately to criticisms from supervisors, the ability to set realistic goals or make plans independently of others. (T. 307-08.) Otherwise, Plaintiff was found to be "not significantly limited" in all other portions of the assessment. (T. 307-308.)

On October 30, 2008, Plaintiff was treated at the emergency room for right-sided body numbness. (T. 324-25.) Plaintiff reported that she stopped taking her medications three weeks prior to the emergency room visit because she had no medical insurance and prescription coverage. (T. 324.) She explained that "[a]fter stopping the medications, she had been having intermittent headaches as well as intermittent difficulties with functioning

levels, fatigue and balance." (T. 324.) She also complained of having weakness and numbness in the right cheek. (T. 324.) On examination, the emergency room doctors found that "[t]here was grade 1 clubbing in [her] fingers." (T 325.) They also found that she had some difficulty with tandem walking. (T. 325.) They further found "[o]bjectively decreased vibration sensation up to the knees bilaterally." (T. 325.) A CT scan of Plaintiff's head revealed left frontal and left parietal encepalomalacia with cortical atrophy. (T. 325.) On October 30, 2008, a CT of Plaintiff's head revealed diffuse thickening of the skull. (T. 317.) The final impression made at the October 30, 2008 emergency room visit by Dr. Hassan was "symptoms of right-sided numbness lasting for about 3 days, however, with no objective clinical findings and no neurological evidence of that deficit. The patient's symptoms are less likely secondary to avascular event, however, it if is still needed, an MRI and MRA of the head would be recommended." (T. 325.)

On December 10, 2008, Plaintiff was treated at University Health Care Center for a followup visit. (T. 343-45.) On examination the doctors found that Plaintiff "is teary eyed and has a flat affect." (T. 343.) "[U]pon further questioning, [they found that Plaintiff] appears to have been having a very depressed mood over the past four to five months." (T. 343.) Plaintiff stated that "she has difficulty sleeping many hours" as she "goes to bed around 9:00 p.m., does not fall asleep until 2:00 a.m., [and] has loss of concentration and decrease in energy." (T. 343.) Plaintiff reported that she has "multiple stressors, including not being able to get Medicaid." (T. 343.) The doctors found that Plaintiff, "at this time definitely seems to have symptoms of depression." (T. 334.) They also found that her "SIGECAPS" [(Sleep, Interest, Guilt, Energy, Concentration, Appetite, Psychomotor, Suicidal)] have been positive

with anhedonia." (T. 334.) They prescribed Citalopram and placed her on the depression pathway program. (T 334.)

On March 19, 2009, Plaintiff saw Dr. Glidden for a follow-up for hypertension, GERD, and depression. (T. 338-42.) Plaintiff complained that "she continues to have difficulty sleeping" and "she does not enjoy activities as much as she used to." (T. 338.) Plaintiff also reported that "she has a poor appetite, a lot of aches and pain, and has had decrease in concentration and energy." (T. 338.) The doctors at University Health Care Center prescribed Citalopram among other medications. (T. 340.)

On April 8, 2009, Plaintiff saw Dr. Rodriguez at the emergency room, complaining of left leg pain and numbness. (T. 328.) Dr. Rodriguez stated that the leg pain was "consistent with sciatica," and prescribed ibuprofen and a muscle relaxer. (T. 329.)

On May 27, 2009, Plaintiff had a follow-up visit with Dr. Loftus. (T. 333) Plaintiff stated that she did not believe Cymbalta was working for her depression, and requested a medication that would treat both depression and fibromyalgia. (T. 335.) Plaintiff's blood pressure seemed to be under control, and Plaintiff believed her gastroesophageal reflux disease symptoms seemed to be relatively under control. (T. 335.) Plaintiff was directed to follow up in three months with rheumatology. (T. 335.)

On July 24, 2009, Dr. Neupane completed a fibromyalgia residual functional capacity questionnaire. (T. 360). Dr. Neupane noted that Plaintiff was last seen on July 6. 2009, and that he had started treating Plaintiff in April 2007, but had not treated her in two years. (T. 360.) Dr. Neupane opined that Plaintiff's fibromyalgia lasted or can be expected to last at least twelve months. (T. 360.) He also found that Plaintiff's impairments are supported by clinical findings, including a positive ANA test and mildly elevated ESR and

creatinine levels. (T. 360.) He opined that Plaintiff's symptoms include multiple tender points, nonrestorative sleep, chronic fatigue, morning stiffness, muscle weakness, subjective swelling, and Raynaud's phenomenon. (T. 360.) He further opined that emotional factors contribute to the severity of Plaintiff's symptoms and functional limitations, and that she is only capable of low stress jobs. (T. 361.) Dr. Neupane opined that Plaintiff could sit for 30 minutes at a time, stand for 15 minutes at a time, sit for less than 2 hours in an 8 hour work day, stand/walk for less than 2 hours in an 8 hour work day, and is in need of a job which permits shifting positions from sitting, standing, or walking. (T. 362.) Plaintiff does not need an assistive device while standing/walking. (T. 362.) Dr. Neupane further opined that Plaintiff can occasionally lift less than 10 pounds, rarely lift 10 pounds, rarely twist, crouch, climb ladders, and occasionally stoop or climb stairs. (T. 363.) Dr. Neupane opined that Plaintiff could use her hands, fingers, and arms 50% of an 8 hour work day to perform repetitive activities. (T. 363). Dr. Neupane opined that these symptoms would produce both "good" and "bad" days, with Plaintiff having to miss work more than four days per month. (T. 363).

Dr. Neupane followed-up with Plaintiff on October 26, 2009. Plaintiff reported taking her medications, and that her pain rating was 5/10. Dr. Neupane noted that Plaintiff's pain rating was 8/10 at her last visit. (T. 382.) Dr. Neupane opined that Plaintiff has good grip, pinch, and fist. (T. 384.) Plaintiff had tender muscular fibromyalgia tender points and pasaspinal muscular tenderness. (T. 384.) Dr. Neupane prescribed Plaquenil among other medications, discussed dietary issues, good sleep hygiene, and recommended low impact aerobic exercise. (T. 384.)

On January 26, 2010, Plaintiff was discharged from Upstate University Hospital after being treated for a deep vein thrombosis ("DVT") of the left upper extremity. (T 365-68.)

On February 17, 2010, Plaintiff followed-up with Dr. Neupane. Plaintiff complained of "pain in her both knees without significant swelling." (T. 435.) Plaintiff reported a pain rating of 5/10. (T. 435). During a physical examination, Dr. Neupane noted some leg swelling, tender fibromyalgia points 18/18, degenerative arthritic changed in her knees and hands, fair grip, pinch, and fist, fair range of motion in her shoulders, and good c-spine range of motion. (T. 436). Dr. Neupane increased Plaintiff's Lyrica prescription, and gave Plaintiff an exercise sheet, again encouraging muscle strengthening exercises. (T. 436.)

On March 30, 2010, a CT of Plaintiff's abdomen and pelvis revealed the following: "mild bibasilar atelectasis, left greater than right," "pericardial effusion/ thickening," "irregular contour of both kidneys," "a right renal legion within the interpolar region of the right kidney . . . concerning for neoplasm such as renal cell carcinoma," "a 1.6 cm left adrenal gland nodule . . . [that] is most consistent with an adenoma." (T. 394-95.)

Plaintiff followed-up with Dr. Neupane on April 5, 2010 for an "urgent visit." (T. 432.) Dr. Neupane noted that Plaintiff had been in the Emergency room in the past month for increased pain in her abdomen, and was found to have a renal mass. (T. 432.) Dr. Neupane noted diffuse tender fibromyalgia points, 18/18. (T. 433.) He also noted decreased range of motion in Plaintiff's shoulders and C-spine movement because of pain, as well as tenderness in her lower-back and knee pain. (T. 433). Dr. Neupane diagnosed Plaintiff with "significantly symptomatic fibromyalgia." (T. 434.) He also opined that Plaintiff "seems very much stressed because of the pain as well as the finding on [the] CT scan which probably

caused the flare up of her fibromyalgia." (T 434.) He increased Plaintiff's dosage of Lyrica. (T 434.)

Plaintiff attended a follow-up appointment with Ann Sweet, N.P.-C. (T. 457-58). On April 9, 2010, Plaintiff treated with Ann M. Sweet, N.P.-C., for depression. (T. 457-58.) Plaintiff complained that "she is tired very often" and "has been more depressed since her admission to the hospital in January for a blood clot." (T. 457.) On examination, Nurse Sweet found that Plaintiff "has some persistent anhedonia" and "persistent anxiety due to her medical issues." (T. 458.) Nurse Practitioner Sweet diagnosed Plaintiff as suffering from depressive disorder. (T. 458.) She prescribed Celexa. (T. 458.)

On May 11, 2010, Plaintiff treated with Nurse Practitioner Sweet for depression. (T. 453-54.) On examination, Nurse Sweet found Plaintiff's mood "mildly to moderately depressed" and her affect "appropriate but sad at times." (T. 453.) She also found "increased anhedonia and decreased energy." (T. 454.) She diagnosed Plaintiff as suffering from depressive disorder. (T. 454.) She continued Plaintiff's Celexa prescription. (T. 454.)

Plaintiff met with Nurse Practitioner Sweet on June 11, 2010. Plaintiff reported that her mood has been better, and that she was feeling better presently. (T. 451). Plaintiff reported no side effects from the Celexa prescription. (T. 451). Plaintiff also reported to recuperating from her surgery and was feeling "a little bit stronger." (T. 451). Nurse Practitioner Sweet opined that Plaintiff's "thought are logical and goal directed. Patient is less depressed and affect is brighter." (T. 452.) Plaintiff continued with "some anhedonia, some decreased energy, [and] concentration and been fair." (T. 452). The Celexa medication was continued. (T. 452.)

On July 7, 2010, Plaintiff met with Dr. Neupane for a follow-up visit.  Plaintiff stated she did not feel good and was under a lot of stress.  (T. 430.)  Plaintiff also complained that she has more pain in her knees and ankles, and that she has "morning stiffness that may sometimes last for the whole day."  (T. 430.) On examination, Dr. Neupane found that Plaintiff "has diffuse tender fibromyalgia points 18/18," "minimal synovitis in her MCP and PIP joints," and "a lot of paraspinal muscular tenderness."  (T. 431.)  Dr. Neupane prescribed Lyrica among other medications.  (T. 432.)

On August 11, 2010, Plaintiff followed-up with Nurse Practitioner Sweet, complaining of feeling tired and having been not doing well as far as her depression. (T. 445-46.)  Nurse Practitioner Sweet noted "increase depressive symptoms."  (T. 445).  Nurse Practitioner sweet increased the citalopram prescription, and also gave contact information for a behavioral therapy group for depression.  (T. 446).

On September 3, 2010, Plaintiff treated with Nurse Practitioner Sweet for depression.  (T. 441.)  Plaintiff complained that "she continues to have some problems with pain, and it is limiting her ability to enjoy her family or get out and do anything with her family."  (T. 441.)  On examination, Nurse Practitioner Sweet found that Plaintiff's "[m]ood is depressed" and her "[a]ffect is sad."  (T. 442.)  She further found that Plaintiff continues to have problems with energy, "which is primarily due to her physical condition."  (T. 442.)  She diagnosed Plaintiff as suffering from fatigue, depression, and anxiety.  (T. 442.)

On October 5, 2010, a CT of Plaintiff's abdomen and pelvis revealed the following: unchanged small hiatal hernia, emphysematous changes in both lower lobes, artherosclerotic disease and aortaand iliac arteries, probable lipoma involving the left latissimus dorsi muscle, left adrenal adenoma, interval resolution of the fluid anterior and lateral to the right kidney,

lesions in the kidney that "are not definitely simple cysts and therefore follow-up examination is needed."  (T. 414.)

Plaintiff met with Dr. Neupane on October 6, 2010 for a follow-up visit. Plaintiff complained of muscle pain in the arms, neck, and knees.  (T 428.)  Plaintiff reported that her dosage of Flexeril was increased to 20 mg at bedtime to help her sleep.  (T. 428.)  However, "she has significant daytime somnolence and fatigue."  (T 428.)  On examination, Dr. Neupane found "minimal synovitis in [Plaintiff's] MCP and PCP joints," "diffuse fibromyalgia tender points 18/18," "a lot of paraspinal muscle tenderness," and "left trochanter area . . . tenderness."  (T. 429.)  Dr. Neupane also noted fair grip, pinch, and fist, as well as fair range of motion in shoulders.  (T. 429)  Dr. Neupane decreased Plaintiff's dosage of Flexeril to 10 mg at bedtime.  (T 429.)

On October 18, 2010, Plaintiff met with Dr. Buchan for a follow-up on depression. (T. 438.)  It was noted that Plaintiff "has been having problems with depression which have worsened over the past year because of her multiple problems and repeated admissions in the hospital."  (T. 438.)  On examination, the doctors found Plaintiff "tearful" with "no eye contact," and a sad mood, but good concentration.  (T. 439.)  They recommended that Plaintiff continue taking her medications and follow-up with Nurse Sweet for her depression. (T. 440.)

## II. STANDARD OF REVIEW

The court's review of the Commissioner's determination is limited to two inquiries. *See* 42 U.S.C. § 405(g).  First, the court must determine whether the Commissioner applied the correct legal standard. See Tejada v. Apfel, 167 F. 3d 770, 773 (2d Cir.1999); Balsamo v. Chater, 142 F. 3d 75, 79 (2d Cir. 1998); Cruz v. Sullivan, 912 F. 2d 8, 9 (2d Cir.1990); Shane

v. Chater, 1997 WL 426203, at *4 (N.D.N.Y. July 16, 1997) (Pooler, J.) (citing Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987)). Second, the court reviews whether the Commissioner's findings are supported by substantial evidence within the administrative record.  See Tejada, 167 F. 3d at 773; Balsamo, 142 F. 3d at 79; Cruz, 912 F. 2d at 9; Rutherford v. Schweiker, 685 F. 2d 60, 62 (2d Cir.1982). The Commissioner's finding will be deemed conclusive if supported by substantial evidence.  See 42 U.S.C. § 405(g); see also, Perez, 77 F. 3d at 46; Rivera v. Sullivan, 923 F. 2d 964, 967 (2d Cir. 1991).  In the context of Social Security cases, substantial evidence consists of "'more than a mere scintilla'" and is measured by "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed.2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 83 L. Ed. 126 (1938)).  Although the reviewing court must give deference to the Commissioner's decision, the Act is ultimately "'a remedial statute which must be liberally applied; its intent is inclusion rather than exclusion." Vargas v. Sullivan, 898 F. 2d 293, 296 (2d Cir. 1990) (quoting Rivera v. Schweiker, 717 F. 2d 719, 723 (2d Cir. 1983)) (internal quotation marks omitted.)

The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The administrative regulations established by the Commissioner require the ALJ to apply a five-step evaluation to determine whether an individual qualifies for disability insurance benefits. See 20 C.F.R. §§ 404.1520, 416.920; see also Williams v. Apfel, 204 F. 3d 48, 48–49 (2d Cir.1999); Bush v.

<u>Shalala</u>, 94 F.2d 40, 44–45 (2d Cir. 1996).

> First, the [Commissioner] considers whether the claimant is currently
> engaged in substantial gainful activity.  If he is not, the
> [Commissioner] next considers whether the claimant has a "severe
> impairment" which significantly limits his physical or mental ability to
> do basic work activities.  If the claimant suffers such an impairment
> which is listed in Appendix 1 of the regulations, [t]he [Commissioner]
> presumes that a claimant who is afflicted with a "listed" impairment is
> unable to perform substantial gainful activity.  Assuming the claimant
> does not have a listed impairment, the fourth inquiry is whether,
> despite the claimant's severe impairment, he has the residual
> functional capacity to perform his past work.  Finally, if the claimant is
> unable to perform his past work, the [Commissioner] then determines
> whether there is other work which the claimant could perform.

<u>Barry v. Schweiker</u>, 675 F. 2d 464, 467 (2d Cir.1982).

## III. DISCUSSION

Plaintiff alleges that the ALJ erred in denying her application for disability benefits in that a) the finding on Plaintiff's Residual Functional Capacity ("RFC") is unsupported by substantial evidence and is the product of legal error (Pl. Mem. 15.); b) the ALJ failed to apply the appropriate legal standards in assessing Plaintiff's credibility (Pl. Mem. 22.); and c) the step 5 determination completed by the ALJ is unsupported by substantial evidence and is the product of legal error.  (Pl. Mem. 24.)  The Court will address each of these claims in turn.

a. The ALJ finding on Plaintiff's RFC

Plaintiff argues that the ALJ's finding of her RFC[1] is not supported by substantial evidence and is the product of legal error in that the ALJ 1) failed to properly apply the treating physician rule; 2) did not properly evaluate the opinions of Dr. Ganesh; and 3)

---

[1] The ALJ's determination is found at T.35.

improperly gave weight to Disability Analyst Marino.

1. The Treating Physician Rule

Plaintiff asserts that the ALJ erred in the RFC determination by failing to apply the treating physician rule.  (Pl. Mem. 15.)  The treating physician rule provides that the opinion of a claimant's treating physical will be given great weight, and that such an opinion may be disregarded if "the treating physician issued opinions that are not consistent with other substantial evidence on the record."  Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004). The treating physician rule is not absolute and the ALJ may weigh several factors in determining how much weight to accord to the treating physician's opinion.  In determining whether to accord great weight to the treating physician's opinion under the treating physician rule, the ALJ must weigh six factors in assessing medical opinions: 1) the length of the treatment relationship and the frequency of examination; 2) nature and extent of the treatment relationship 3) the supportability of medical findings in the record; 4) the consistency of an opinion with the record as a whole; 5) the physician's specialization with respect to the opinion; and 6) any other relevant factors. See, 20 C.F.R. 404.1527. Unless the ALJ gives a treating physician's opinion controlling weight under (d)(2) of this section, the ALJ will consider these six factors in deciding the weight given to any medical opinion.  See, 404.1527(d).

The Court finds that the ALJ acted well within his discretion by affording little weight to the opinion of Dr. Neupane.  With respect to factor one, Dr. Neupane's July 24, 2009 restrictive finding[2] on Plaintiff's abilities were based on a single questionnaire, and until July

---

[2] Dr. Neupane found multiple work related restrictions of Plaintiff in this report, including only being able to lift 10 lbs. rarely, and only being able to stand for 15 minutes at a time. (T. 362, 63)

6, 2009, he had not treated Plaintiff for two years. (T. 360). Guided by the six factor test, the fact that Dr. Neupane's opinion was based on one questionnaire and that Dr. Neupane had not treated Plaintiff in two years supports the ALJ's finding that Dr. Neupan's opinion was not accorded controlling weight.

Additionally, the ALJ rightly accorded little weight to Dr. Neupane's opinion because evidence in the record contradicts his evaluation. (T. 52, 54.). In his July 2009 questionnaire Dr. Neupane indicated that Plaintiff's pain and/or symptoms would frequently interfere with her "attention and concentration needed to perform even simple work tasks." (T. 361.) However, at the end of September 2008, Dr. Barry stated that even though Plaintiff malingered on testing, she appears "able to follow and understand simple direction and instructions. She is able to maintain her attention and concentration. She was in regular education classes during her schooling. She did obtain a GED." (T. 285.) Again contrary to Dr. Neupane's findings, in September 2010 Nurse Practitioner Sweet stated that Plaintiff's "[t]houghts are logical and goal directed ... patient appears to have good cognition. Insight and judgment are fair." (T. 442.) Most notably, in October 2008, Dr. Nobel found Plaintiff's "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods" was "not significantly limited." (T. 308). Dr. Barry and Nurse Practitioner Sweet's opinions contradict Dr. Neupane's evaluation.

In addition to contradictory medical opinions, the fact that Plaintiff is a child care provider and engaged in a wide range of daily activities contradicts Dr. Neupane's assertion that Plaintiff is disabled. Dr. Neupane assessed that Plaintiff could sit for 20 minutes at a time, stand for 15 minutes at a time, sit for less than 2 hours in an 8 hour work day, and

stand/walk for less than 2 hours in an 8 hour work day. (T. 362). Plaintiff could occasionally lift less than 10 pounds, rarely lift 19 pounds, rarely twist, crouch, climb ladders, and occasionally stoop or climb stares. (T. 363). On these findings, Dr. Neupane's opinion was that Plaintiff is in need of a job that permits shifting positions from sitting, standing, or walking and that accommodates her pain and/or symptoms. (T. 362). The ALJ, however, found in the record that Plaintiff worked as a child care provider for 2 years. (T. 36). This activity does not amount to substantially gainful activity, but the physical and mental demands of caring for children over a two year period contradict Dr. Neupane's findings that Plaintiff is not physically and mentally capable of working.

Accordingly, the ALJ properly gave little weight to Dr. Neupane's opinion despite being the treating physician.

2. Dr. Ganesh's Opinion

Plaintiff argues that this case should be remanded for the proper weighing of Dr. Ganesh's opinion. (Pl. Mem. 19-20.) The Court finds that the ALJ properly weighed Dr. Ganesh's opinion in his decision, making remand unnecessary.

Dr. Ganesh found that Plaintiff had no limitations on her abilities to sit, stand, walk, or use her upper extremities. (T. 280). Plaintiff argues that these findings are vague and the ALJ cannot rely on a consultative examiner's vague findings. (Pl. Mem. 20). She cites Dickson v. Comm'r of Soc. Sec., No. 1:04-CV-1296 (NAM/RFT), 2008 U.S. Dist. LEXIS 14825 at *23 (N.D.N.Y Feb. 27, 2008) (Mordue, C.J.) (citing Curry v. Apfel, 209 F.3d 117, 123 (2d Cir. 2000), to support this argument. The Court finds insufficient support for this argument. In Curry the court held that a consultative examiner's use of terms like "mild" or "moderate" used to describe a patient's physical condition are vague and the ALJ cannot rely

on them to decide that the plaintiff is capable of working.   <u>Curry</u>, 209 F.3d 117 at 123.  Here,

Dr. Ganesh made specific findings based on a physical examination of Plaintiff.  (T. 278-

281).  Dr. Ganesh did not use broad terms such as "mild" or "moderate" when describing

Plaintiff's condition.  Instead Dr. Ganesh made unequivocal findings that Plaintiff had "no

gross limitation" on her ability to sit, stand, walk, or use her upper extremities.  (T. 280).

Furthermore, Dr. Ganesh found that Plaintiff: is a childcare provider for three children, one

being a seven-month-old (T. 278.); uses no assistive devices (T. 279.); shows full flexion,

extension, lateral flexion bilaterally, and full rotary movement bilaterally (T. 279.); has 5/5

strength in upper and lower extremities (T. 279); and has 5/5 grip strength bilaterally in her

hands. (T. 280.)   Accordingly, Dr. Ganesh's findings were not vague and the ALJ was not

precluded from according more weight to these findings than the treating physician's

evaluation.

Moreover, Dr. Ganesh's findings are consistent with the medical record as a whole,

aside from the opinions of Dr. Neupane.  In April 2007, Dr. Clark found Plaintiff's gross motor

strength to be 5/5 in her upper and lower extremities.  (T. 269.)   In April 2009, Dr. Rodriguez

found that Plaintiff has 5/5 power in upper and lower extremities. (T. 329.)  Dr. Neupane

himself had findings similar to Dr. Ganesh's, stating that although Plaintiff has tender

fibromyalgia points, she has "no evidence of . . . [a] limitation of motion in both upper and

lower extremity joints . . . she has good grip, pinch, and fist." (T. 356).  In a subsequent

examination Dr. Neupane again found no limitation of motion in either Plaintiff's upper and

lower extremity joints on August 10, 2007.  (T. 380).

Plaintiff also argues that the opinion of a consultative examiner cannot override the

opinion of the treating physician.  (T. 19).  Generally, a consultative examiner's evaluation

should be given less weight than the treating physician's evaluation. <u>Cruz v. Sullivan</u>, 912 F.2d 8, 13 (2d Cir. 1990). This is because consultative examinations are typically brief and only give the examiner a glimpse of the patient's health on one particular day. <u>Anderson v. Astrue</u>, No. 07-CV-4969, 2009 U.S. Dist. LEXIS 77602, at *28 (E.D.N.Y. Aug. 28, 2009). When other evidence in the record, however, contradicts the treating physician's opinion, the opinion of a consultative examiner can override that of a treating physician. <u>See</u> 20 C.F.R. §§ 404.1527(d)(2), 416. 927(d)(2); <u>Snell v. Apfel</u>, 177 F. 3d 128, 132–33 (2d Cir. 1999) (holding that the treating physician's evaluation is not dispositive of disability when the evaluation is contradicted by other substantial evidence); <u>Mongeur v. Heckler</u>, 722 F.2d 1033, 1039 (2d Cir. 1983).

Here Dr. Neupane, although he was the treating physician, made the restrictive evaluation on Plaintiff's abilities on a single evaluation, two years after his previous examination of Plaintiff. (T. 360). Therefore, Plaintiff's argument that Dr. Ganesh's evaluation should be given less weight because Dr. Ganesh evaluated Plaintiff on one occasion is weak because Dr. Neupane himself made his evaluation after examining Plaintiff on one occasion after a two year hiatus. Furthermore, other medical evaluations, including Dr. Ganesh's opinion, contradict Dr. Neupane's opinion. Because the record indicates that Dr. Neupane's evaluation of Plaintiff was no more thorough than Dr. Ganesh's evaluation, and Dr. Neupane's opinion is contradicted by other medical evaluations, the ALJ did not err in according more weight to Dr. Ganesh's opinion than that of Dr. Neupane.

3. Disability Analyst Marino's Opinion

Plaintiff argues that the Court should order a remand for reconsideration of Plaintiff's RFC without the opinion of Disability Analyst Marino, as a disability analyst has no

medical training; and it was contrary to the Administration's policy which prohibits an ALJ to rely on the assessments of a Single Decision Maker.  (Pl. Mem. 21.)  The Court disagrees.

The ALJ's consideration of Marino's opinion constitutes harmless error because the ALJ gave Marino's opinion such little weight that it did not affect the substantial rights of the parties.  An error made by the ALJ warrants remand only when the error was harmful.  An error is harmless when it does not affect the substantial rights of a party.  <u>Mays v. Bowen</u>, 837 F.2d 1362, 1364 (5th Cir. 1988).  A party seeking remand for error must show that the result of the proceeding could have been different but for the error.  <u>Brock v. Chater</u>, 84 F.3d 726, 729 n.1 (5th Cir. 1996); <u>see</u> <u>Shinseki v. Sanders</u>, 556 U.S. 396, 129 S. Ct. 1696, 1706, 173 L. Ed.2d 532 (2009) (burden of showing harmful error "falls on the party attacking the agency's determination") (citing <u>Nelson v. Apfel</u>, 131 F. 3d 1228, 1236 (7th Cir. 1997); <u>Zabala v. Astrue</u>, 595 F. 3d 402, 409 (2d Cir. 2010) (remand unnecessary where "application of the correct legal principles . . . could lead only to the same conclusion" (internal quotation marks and brackets omitted)); <u>Mitchell v. Astrue</u>, No. 09–CV–6301, 2010 WL3070094, at *4 (W.D.N.Y. Aug. 4, 2010) (remand inappropriate where Plaintiff fails to show that any alleged error "was determinative of . . . the final RFC assessment").

Plaintiff failed to show that the ALJ's decision could have been different if the ALJ had not weighed Marino's opinion.  The ALJ carefully noted that Marino "is a non-medical review official whose findings do not qualify as a medical source opinion."  The ALJ further noted that he only gave "some weight" to the opinion of Marino to the extent that his "findings constitute a determination, based on a review of the medical evidence and the application of Social Security disability rules and polices . . ." (T. 37-38.)  Because the ALJ did not give much weight to the disability analyst's opinion, and because the medical evidence record

supports the ALJ's determination, this does not constitute a basis for remand. <u>See</u> <u>Lawton v. Astrue</u>, No. 1:08–CV–0137, 2009 WL 2867905, at *16 n. 28 (N.D.N.Y. Sept. 2, 2009) (no error in assigning "only slight weight" to the opinion of a disability analyst). Plaintiff has not demonstrated that she was prejudiced by the minimal weight afforded this opinion.  Plaintiff is correct in pointing out that the ALJ erred in giving weight to Marion's opinion, but she fails to argue that ALJ's decision could have been different if he had not weighed Marino's opinion.  Thus, the Court finds no reason for remand on this ground.

b. Plaintiff's Credibility

Plaintiff contends the ALJ did not apply the appropriate legal standards in assessing Plaintiff's credibility.  (Pl. Mem. 22)  The ALJ found that Plaintiff was not credible in her statements regarding ". . . the intensity, persistence and limiting effects of [her] symptoms . . ." (T. 36).  Factors to be considered in the context of symptoms claimed by a Plaintiff are set forth in 20 C.F.R. §§ 404.1529(c)(3), which include Plaintiff's daily activities and medications.  Additionally, "the ALJ has the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." <u>Marcus v. Califano</u>, 615 F. 2d 23, 27 (2d Cir. 1979).  If the findings "are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain." <u>Aponte v. Secretary, Dep't of Health & Human Services</u>, 728 F.2d 588, 591 (2d Cir.1984); <u>see</u> <u>also</u> <u>McLaughlin v. Secretary of Health, Education and Welfare</u>, 612 F. 2d 701, 704 (2d Cir. 1982).

Here, the ALJ properly found Plaintiff's credibility to be diminished regarding the intensity and limiting effect of her symptoms.  The ALJ noted that Plaintiff worked as a child

care provider from August 2008 to January 2010, cooks three times a week, cleans and does laundry once a week, and shops once a month.  (T. 36.)  The ALJ also considered that Plaintiff told Dr. Barry that she attends church and is involved in activities there, and maintains friendships.  (T. 36.)  Moreover, the ALJ found a lesser credibility after noting that Plaintiff showed "poor effort and malingering" on her examination by Dr. Barry.  (T. 36.)  Lastly, the ALJ's conclusion on Plaintiff's credibility was founded on Plaintiff testifying that her weight had increased from 150 to 210 pounds as a result of her Lyrica, however the medical record indicates that Plaintiff's weight had remained stable from 2007, ranging from 188 to 198 pounds.  (T. 36.)

Although the Court is sympathetic to the limitations that arise from her medically diagnosed conditions, the ALJ's rationale for finding Plaintiff not fully credible is apparent from a reading of the decision.  Moreover, the Court finds that substantial evidence supports the ALJ's decision that the bulk of the objective medical evidence was inconsistent with the full extent of Plaintiff's subjective complaints. Thus, the ALJ's finding that Plaintiff was not fully credible will not be disturbed on review.  <u>Aponte v. Sec'y, Dep't of Health & Human Servs. of U.S.</u>, 728 F. 2d 588, 591 (2d Cir. 1984)

c. The ALJ did not Err in Making His Conclusion Without a Vocational Expert

Plaintiff lastly objects stating that the ALJ's Step 5 determination in her disability is unsupported by substantial evidence and is the product of legal error; specifically contending that the ALJ failed in obtaining the testimony of a vocational expert because of Plaintiff's nonexertional limitation.  (Pl. Mem. 24-25.)

An ALJ may rely on the Grids for guidance in determining the range of work available to a claimant without calling a vocational expert, even if the claimant has

nonexertional limitations, as long as those limitations do not significantly erode the range of work that would otherwise be available to the claimant. <u>Bapp v. Bowen,</u> 802 F. 2d 601, 605 (2d. Cir. 1986).

Here, the ALJ relied on substantial evidence on the record that although the plaintiff had some nonexertional limitations, the plaintiff retained the mental capabilities to perform the basic mental demands of work. (T. 39). Plaintiff argues that Dr. Neupane's opinion supports the conclusion that Plaintiff had significant nonexertional limitations, but as discussed above Dr. Neupane's opinion is not dispositive and the ALJ chose not to accord it much weight. As such, it was not error for the ALJ to fail to employ a vocational expert because there is substantial evidence supporting the ALJ's conclusion that "the evidence established that the claimant has no significant limitations in the performance of these basic mental demands at work"[3] (T. 39.), and that "her occupational bases at the light and sedentary levels or work are maintained such that jobs exist in significant numbers in the national economy." (T. 39.) Additionally, there is substantial evidence on which the ALJ could conclude that Plaintiff has no significant physical nonexertional limitations that would establish a necessity for a vocational expert, based upon her various medical examinations. Accordingly, the ALJ did not commit an error when he failed to employ a vocational expert to evaluate Plaintiff's abilities to obtain employment.

**IV. CONCLUSION**

For the foregoing reasons, the Court **AFFIRMS** the final decision of the

---

[3] Referring to the mental demands set forth in Social Security Ruling 85-15. (T. 39.)

Commissioner of Social Security.

IT IS SO ORDERED

Dated: September 5, 2013

_____
Thomas J. McAvoy
Senior, U.S. District Judge